UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MEDIKE INTERNATIONAL CORP., *et al.*,

                    Plaintiffs,

-v-

BRYAN GILLER, *et al.*,

                    Defendants.

23-CV-8939 (JPO)

OPINION AND ORDER

---

J. PAUL OETKEN, District Judge:

Plaintiffs Medike International Corp. ("Medike") and Medike, LLC (collectively, "Medike") brought this action against defendants Bryan Giller, Kimberly Barnes, KT Deri Sanayi Ticaret Anonim Sirketi ("KY Turkey"), KT Trade, LLC ("KT USA"), KT Trims and Accessories GmbH ("KT Germany"), JOHN DOES 1–20, and ABC ENTITIES 1–10 (collectively, "Defendants"), asserting claims for misappropriation of trade secrets pursuant to the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836(b)(1), New York common law, and the Georgia Trade Secrets Act of 1990 ("GTSA"), Ga. Code Ann. § 10-1-760 *et seq.*, and for unfair competition, tortious interference with business relations, breach of contract, breach of the duty of loyalty, and conversion.  Presently before the Court is Medike's application for a preliminary injunction to enjoin Defendants from the disclosure of Medike's trade secrets and the solicitation of Medike's customers.

I.   **Background**

    A.   **Factual Background**

Medike International Corp. does business in the United States through its subsidiary, Medike, LLC.  (ECF No. 1 ("Verified Compl.") ¶ 5.)  Medike services clients in the fashion and apparel industries by producing custom labels, trims, and other accessories using various

substrates, including leather, faux leather, and paper.  (*Id.* ¶ 14.)  Defendant Bryan Giller was employed by Medike, LLC from May 2, 2005, until January 16, 2023, first as a salesperson, and later as the Manager and Vice President of Sales and Marketing.  (*Id* ¶ 7.)  Giller was based in New York.  (*Id.* ¶ 33.)  Defendant Kimberly Barnes was employed by Medike, LLC from October 27, 2007, to February 8, 2023, as a customer service representative, in which she provided administrative support to Giller.  (*Id.* ¶¶ 8, 46.)  Barnes was based in Georgia (*Id.* ¶ 46.)

Medike alleges that it has developed and maintained trade secrets including proprietary designs, materials, collections, customer lists, customer preferences, business data, suppliers, costing and pricing information.  (*Id.* ¶¶ 25, 29.)  During their employment with Medike, Giller and Barnes had access to Medike's alleged trade secret information.  (*Id.* ¶¶ 33-38, 46-51.)  Both Giller and Barnes signed employment agreements with Medike that included non-disclosure provisions.  (*Id.* ¶¶ 38-40, 46-51.)

In or around October 2022, Giller received a call from an employee at KT Trims, who relayed that KT Trims was seeking a salesperson in the New York area with experience selling labels to vendors in the denim industry.  (ECF No. 19-1 ("Giller Decl.") ¶ 23.)  Giller resigned from Medike on or about January 13, 2023, and joined KT Trims as its Vice President of Sales and Marketing.  (*Id.* ¶¶ 43-44.)  Upon joining KT Trims, Giller contacted Barnes regarding the possibility of Barnes joining KT Trims and supporting Giller in his new position, and Barnes subsequently interviewed with KT Trims.  (ECF No. 19-5 ("Barnes Decl." ¶ 7.)  Giller submits that he did not have authority to hire Barnes, but that he offered to connect her with the relevant decisionmakers at KT Trims. Barnes resigned from Medike on or about February 8, 2023 and also joined KT Trims.  (Verified Compl. ¶ 53.)

Upon Giller's resignation, Medike demanded the return of Giller's phone and company computer, reviewed his e-mails and phone records, and sent personnel to its New York sales office to review the inventory of items kept there. (*Id.* ¶ 61.) Upon receiving Giller's phone and computer, Medike discovered that Giller had deleted all of the files stored on both devices. (*Id.* ¶ 62.) Giller avers that he deleted all of the information stored on both devices prior to returning them because, per Medike's consent, Giller had been using both devices for personal use as well as business use, and the devices therefore contained his personal information, including "personal emails, photographs, financial records, bank statements, mortgage records, family contact information, and other personal information." (Giller Decl. ¶ 31.) Medike was able to review the emails stored on its servers, as well as Giller's certain phone logs from Giller's mobile phone service provider. (Verified Comp. ¶ 62.) Medike found that on several occasions, Giller sent emails to his personal email address containing Medike's alleged trade secrets, and that Giller had several phone calls with KT Trims. (*Id.* ¶¶ 63-65.) Giller states that he sent these documents to his personal email account for ease of access and use in connection with his job at Medike, and that he never transmitted ay of this information to KT Trims. (Giller Decl. ¶ 21). Medike also discovered that Giller had removed material swatch books and material collections from the New York sales office. (Verified Compl. ¶ 67.) Giller submits that he brought some of Medike's sample swatches for a meeting with KT Trims "for the sole purpose" of ensuring that KT Trims was able to produce labels of the same quality as Medike because Giller did not want to change companies and offer customers an inferior product, which would "hurt [his] reputation." (Giller Decl. ¶ 24.) Moreover, Giller contends that the swatches he showed to KT Trims "consisted of products already being sold in the market and at major department stores"

and that these "swatches are made from materials supplied by third parties which are openly shown to customers and prospective customers, and they are not confidential." (*Id.* ¶ 25.)

Medike alleges that "KT Trims has been engaged in a global effort to poach several of Medike's key employees in order to obtain Medike's confidential, proprietary, and trade secret information." (Verified Compl. ¶¶ 72-100.) Most recently, Medike alleges, on October 3, 2023, Medike learned that, on September 21, 2023, Giller had approached another Medike employee—Medike General Manager Michael Ware—about joining KT Trims. (*Id.* ¶ 112.) Giller submits that he did reach out to Ware to see if Ware had an interest in managing a KT Trims plant in Pennsylvania should such an opportunity become available, but that he was not authorized to offer Ware a position. (Giller Decl. ¶ 42.)

Medike also alleges that KT Trims has become the new supplier of one of Medike's customers that Giller serviced during his employment with Medike. (Verified Compl. ¶¶ 106-110.) Giller states that two customers he serviced while at Medike have since placed orders with him at KT Trims. (Giller Decl. ¶ 39.)

**B.     Procedural History**

On October 1, 2023, Medike commenced this action and simultaneously filed a proposed order to show cause seeking a temporary restraining order and a preliminary injunction. (*See* ECF Nos. 1, 5.) Medike requested an order preliminarily enjoining Defendants from (1) using, disclosing, or disseminating Medike's confidential and proprietary information and trade secrets, (2) soliciting, contacting, or doing business with Medike's former or potential customers, and (3) soliciting or contacting any of Medike's employees. (*See* ECF No. 5.) The court held a telephone conference on October 16, 2023. The Court denied Medike's application for a temporary restraining order, but set a schedule on its requested preliminary injunction.

Defendants filed their opposition on October 30, 2023.  (ECF No. 19.)  Medike filed its reply on November 8, 2023.  (ECF No. 22.)  The Court held oral argument on November 9, 2023.

## II.     Legal Standard

A party seeking a preliminary injunction must show "(1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *RiseandShine Corp. v. PepsiCo, Inc.*, 41 F.4th 112, 119 (2d Cir. 2022) (quoting *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018)).

## III.    Discussion

### A.     Likelihood of Success on the Merits

#### 1.     Whether Medike Is Likely to Succeed on its Misappropriation of Trade Secrets Claims

The requirements for showing a misappropriation of a trade secret are similar under New York state law, Georgia state law, and federal law.  Under the DTSA, "a party must show an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty." *Free Country Ltd v. Drennen*, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016) (internal citations and quotation marks omitted).  The standard is the same under the GTSA.  *Johnson Matthey Process Techs., Inc. v. G.W. Aru LLC*, 603 F. Supp. 3d 1374, 1381 (S.D. Ga. 2022).  Similarly, "[u]nder New York law, a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *Free Country Ltd*, 235 F. Supp. 3d at 565

(S.D.N.Y. 2016) (citing *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43–44 (2d Cir. 1999)). Both the DTSA and New York law place the burden on the claimant to identify a purported trade secret with "sufficient specificity." *Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc.*, 68 F.4th 792, 800 (2d Cir. 2023). Whether a trade secret exists, including whether a claimant has adequately identified the trade secret with "sufficient specificity," is "a fact-specific question to be decided on a case-by-case basis." *Id.* at 801. Medike argues that its material swatches, pricing models, and customer lists are "trade secrets" under the DTSA, GTSA, and New York common law. The Court considers each of these in turn.

"Under Second Circuit precedent, a customer list 'developed by a business through substantial effort and kept in confidence may be treated as a trade secret. . . provided the information it contains is not otherwise readily ascertainable.'" *Free Country Ltd*, 235 F. Supp. 3d at 566 (quoting *N. Atl. Instruments, Inc.*, 188 F.3d at 46); *Cont'l Indus. Grp., Inc. v. Altunkilic*, 788 F. App'x 37, 41 (2d Cir. 2019). "The question of whether or not a customer list is a trade secret is generally a question of fact." *Free Country Ltd*, 235 F. Supp. 3d at 566 (quoting *A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 89 (2d Cir. 1991)). Courts in the Second Circuit have held that when the "substantial effort" devoted to the development of the customer list amounts to mere "widespread canvassing," a customer list is not given trade secret protection. The Court considers "whether the effort invested in developing the customers simply involved widespread canvassing . . . or whether the employer actually worked to create a market for a new service or good." *Webcraft Techs., Inc. v. McCaw*, 674 F. Supp. 1039, 1045 (S.D.N.Y. 1987) (involving a product which required a "long, difficult process to educate and convert a prospective customer to the benefits of" the product, in which the Court concluded that "the confidential value of [the] customer list lies not only in its identification of someone's customers

6

. . . but more importantly, especially for competitors in the [industry], in that it identifies customers who have learned and have bought the benefits of [the product]"); *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 394 (1972) ("Although plaintiffs have demonstrated an investment of time and money in developing a patronage . . ., the investment was not an attempt to create a market for a new type of service . . . . Rather, that investment reflected simply widespread canvassing of an obvious and highly competitive market.")

The "customer list" that Medike contends Giller misappropriated is the contact information of the customers Giller handled. Giller did not have access to any information pertaining to the customers handled by other sales representatives. (Giller Decl. ¶ 14.) Prior to Giller's resignation, Medike did not maintain a master customer list containing the names and contact information of Giller's customers; upon his departure, Barnes was tasked with compiling a master list containing Giller's customers' information for Medike. (Barnes Decl. ¶ 16.) Prior to Barnes's compilation of this list, there was no consolidated list of Giller's customer information. (*Id*.)

Medike submits that "[i]dentifying a customer contact . . . requires trying to find the trim manager or designer to get an appointment with," and this process of "[f]inding the right person is the hardest, most time-consuming part of the job." (ECF No. 22-3 ("Dylong Decl.") ¶ 8.) "[I]t is virtually impossible to have a Brand connect you with their Trim Manager or designer by simply contacting a general phone number or e-mail address associated with the Brand." (ECF No. 22-1 ("Ware Decl.") ¶ 15.) Giller submits, and Medike acknowledges, that customer contacts can be identified through searching on Google and LinkedIn. (Giller Decl. ¶ 16; Dylong Decl. ¶ 9.) Medike contends, however, that individuals do not typically respond to these direct messages. (Dylong Decl. ¶ 9.) In order to obtain email addresses, the Vice President of North

American Sales will "often try to guess an e-mail address associated with the particular individual, and send an e-mail." (*Id.* ¶ 10.)

It appears that some of this contact information is easily obtained by conducting a Google or LinkedIn search, thus requiring virtually no effort, while some of this contact information, such as obtaining the correct email addresses, requires more effort. But even obtaining the correct email addresses is a matter of widespread canvassing. Overall, the Court is not persuaded that the development of the customer list rose to the level of "substantial effort." Even assuming that the development of the customer list requires "substantial effort," this information is "readily ascertainable" through conducting a Google or LinkedIn search. Under such circumstances where contact information is ascertainable through sources including Google or LinkedIn, courts have found that the contact information is readily ascertainable. *Free Country Ltd*, 235 F. Supp. 3d at 566. And, moreover, Medike's "customers are well-known apparel retailers whose identities are not protected." (Giller Decl. ¶¶ 15, 17); *see Free Country Ltd*, 235 F. Supp. 3d at 566.

Medike also alleges that its customer preferences information is entitled to trade secret protection. "[T]rade secret protection will not attach to customer information that can easily be recalled or obtained from the customers themselves." *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 537 (S.D.N.Y. 2004) (internal citations omitted); *see also EarthWeb, Inc. v. Schlack*, 71 F. Supp. 2d 299, 315 (S.D.N.Y. 1999) ("[I]t is well established that an employee's recollection of information pertaining to specific needs and business habits of particular customers is not confidential.") (internal quotation marks and citations omitted). "Thus, absent the physical removal of actual . . . client lists, it is difficult to show the misappropriation of these types of trade secrets or confidential information." *Johnson Controls,*

*Inc.*, 323 F. Supp. 2d at 537 (citing *See EarthWeb*, 71 F.Supp.2d at 315).  Here, Medike alleges that Giller and Barnes had access to information regarding Medike's customer preferences, and Defendants misappropriated this information.  Medike does not allege that this information was contained in a specific document or file, but rather, that through their work, Giller and Barnes were exposed to and knew this information.  This type of customer preference information, which can easily be recalled or obtained from the customers themselves, is not a protectable trade secret.  Such information is better described as "general knowledge in the trade or business," which is not entitled to trade secret protection.  *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475 (1974); *Johnson Controls, Inc.*, 323 F. Supp. 2d at 537 ("matters of public or general knowledge in an industry are incapable of being designated as a trade secret").

Next, Medike alleges that its pricing information is entitled to trade secret protection.  "Data relating to pricing can constitute a trade secret under some circumstances." *Free Country Ltd*, 235 F. Supp. 3d at 566-67 (citing *In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009)).  "However, this is generally where a company uses some type of proprietary formula that gives it a unique advantage, such as a complex pricing or trading algorithm in a financial business. *Id.* at 567 (internal citations omitted).  "On the other hand, information relating to [a company's] underlying mechanics, such as the prices of materials and costs of manufacturing, are not trade secrets because any seller's publicly-available prices signal to competitors some information about the underlying mechanics of the seller's pricing structure." *Id.* (internal quotation marks and citations omitted).  Here, Medike has not alleged that Giller had access to, let alone misappropriated, a proprietary formula.  (Giller Decl. ¶¶ 18-19.)  Medike's pricing information is therefore not entitled to trade secret protection.

Finally, Medike argues that its material swatch books and collections are entitled to trade secret protection. Giller submits that the swatches he shared with KT Trims were labels that were already available on the market and were openly shown to customers and prospective customers. (Giller Decl. ¶ 25.) A product that is on the market is publicly available and is therefore not entitled to trade secret protection. And, if Medike is readily sharing the swatches with outside entities without any effort to maintain their confidentiality, the swatches are not entitled to trade secret protection. Medike responds that "the specific identity of the samples Defendants admit Giller provided to KT is unknown because, to date, those samples were not returned to Medike, nor do Defendants assert that those samples were returned." (ECF No. 22 at 5.) At this juncture, with the evidence presently before the Court, the Court concludes that Medike has failed to establish a likelihood of success on the merits that the swatches are trade secrets.

### 2. Whether Medike Is Likely to Succeed on its Breach of Contract Claims

"To state a claim for breach of contract under New York law, 'the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages.'" *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015) (quoting *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir.2011)). Giller's most recent employment agreement was dated October 15, 2016, and expressly stated that "[t]he term of this agreement is for 5 years." (ECF No. 19-2.) By its terms, Giller's employment agreement expired on October 24, 2021. Nevertheless, because Giller and Medike continued their employer-employee relationship as if the employment agreement remained in effect, the Court construes the agreement as remaining in effect until Giller's resignation in

January 2023.  *See, e.g., ServiceMaster Residential/Commercial Servs., L.P. v. Westchester Cleaning Servs., Inc.*, 2001 WL 396520, *2 (S.D.N.Y. April 19, 2001).

Medike alleges that Giller breached the confidentiality provision of his employment agreement.  That provision states: "During the course of your employment, you will acquire information about Medike business, clientele, people, intellectual property and financial affairs.  All such information must be treated as confidential and private during and after your employment." (*Id.*)  The agreement further states that if Giller should "choose to leave Medike to pursue other opportunities . . . [t]he confidentiality of Medike Corporate information will need to be respected and all Medike property and materials must be returned." (*Id.*)  Medike argues that the information Giller allegedly shared with KT Trims was in breach of this confidentiality provision.  For the reasons discussed above, the Court has concluded that Medike failed to establish a likelihood of success on its trade secret claims.  The Court declines to enforce the confidentiality provision as preventing Giller from using the general business knowledge he acquired at Medike, indefinitely following his employment.  Such a construction would be overbroad.  Medike therefore fails to establish a likelihood of success on this breach of contract claim.

Medike also alleges that Giller violated the non-solicitation and non-recruitment provisions of his employment agreement.  The non-solicitation and non-recruitment provisions have an express durational limit of six months following Giller's departure from Medike.  (*See* ECF 19-2).  These provisions were therefore no longer in effect as of July 16, 2023.  Medike alleges that Giller reached out to Medike's employee Michael Ware on September 21, 2023, allegedly to offer him a position with KT Trims.  Even if Giller did recruit Ware, the alleged recruitment took place after the expiration of the non-recruitment provision, and thus could not

have violated that provision. Similarly, Medike does not offer evidence establishing a likelihood that Giller violated the non-solicitation provision within the six-month period. Moreover, even if he had violated either contractual provision within the six-month period, because that period expired months before Medike sought an injunction, such a violation would not establish a likelihood of success with respect to a breach remediable through *injunctive* relief. The Court therefore concludes that Medike has failed to establish a likelihood of success on the merits on these remaining breach of contract claims with regard to Giller.

Medike's only breach of contract claim with respect to Barnes pertains to her alleged misappropriation of trade secrets. (ECF No. 16-2 at 24-25.) For the reasons discussed above, Medike has failed to establish a likelihood of success on the merits on its trade secrets claim. Medike therefore fails to establish a likelihood of success on the merits on its breach of contract claims with regard to Barnes.

### 3. Whether Medike Is Likely to Succeed on its Breach of the Duty of Loyalty, Unfair Competition, and Conversion Claims

Medike also argues that Giller has violated his duty of loyalty to Medike, and that Giller and KT Trims engaged in unfair competition by virtue of Giller's disclosure and Defendants' use of Medike's confidential information and trade secrets. (ECF No. 16-2 at 27-28). Because the Court has concluded that Medike has failed to establish a likelihood of success on the merits on its trade secrets claims, the Court also concludes that Medike has failed to establish a likelihood of success on its duty of loyalty and unfair competition claims.

Medike also brings conversion claims against Giller and KT Trims. "To establish a cause of action for conversion under New York law, a plaintiff must show (1) legal ownership or an immediate superior right of possession to a specific identifiable thing and (2) that the defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition

or to the exclusion of the plaintiff's rights." *Phansalkar v. Andersen Weinroth & Co., L.P.*, 175 F. Supp. 2d 635, 639 (S.D.N.Y. 2001) (citations and quotation marks omitted). Medike argues that Giller and KT Trims committed conversion by removing Medike's material swatch books and collections from the New York office and providing them to KT Trims for cross-referencing. There is no dispute that Medike provided Giller with the samples, and that the samples were rightfully in Giller's possession. And while Giller admits that he brought some sample swatches to a meeting with his new employer, as discussed above, Medike has failed to establish that the samples are protectable trade secrets. The evidence suggests that these samples had been produced by Medike and were already available in the market. Medike has failed to establish that, in sharing the swatches with KT Trims for cross-referencing, Giller disclosed proprietary information.

### B. Irreparable Harm

"Irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir. 1983)). "Accordingly, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Id.* (quoting *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir.1990)). "The movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." *Id.* (quoting *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995)). "In the absence of a showing of irreparable harm, a motion for a preliminary injunction should be denied." *Id.* (first citing *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 80 (2d Cir. 1990), and then citing *Sierra Club v. Hennessy*, 695 F.2d 643, 647 (2d Cir. 1982)).

Medike fails to establish actual and imminent irreparable harm. Delay in seeking a preliminary injunction "may. . . indicate an absence of the kind of irreparable harm required to support a preliminary injunction." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (internal citations omitted); *Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (2d Cir. 1985) ("Lack of diligence, standing alone, may . . . preclude the granting of preliminary injunctive relief, because it goes primarily to the issue of irreparable harm.") Medike filed the instant application on October 11, 2023. (*See* ECF No. 5.) Giller resigned from Medike on or about January 13, 2023, over nine months before Medike filed this application. (Giller Decl. ¶ 30). Similarly, Barnes resigned from Medike on or about February 8, 2023, over eight months before Medike filed this application. (Barnes Decl. ¶ 10.) On or about March 21, 2023, approximately seven months before filing this application, Medike became aware that KT Trims had become a new supplier for one of Medike's longtime customers, which Giller had serviced during his employment at Medike. (Verified Compl. ¶¶ 106-108.) Medike's months-long delay in filing the instant application indicates an absence of imminent irreparable harm necessary for the issuance of a preliminary injunction.

Medike argues that it is entitled to a "rebuttable presumption of irreparable harm," which "might be warranted in cases where there is a danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). This presumption does not apply here, where Medike has failed to establish a likelihood of success on the merits with regard to the existence of a trade secret.

### C.   Balance of the Equities and Public Interest

The balance of the equities and public policy also weigh in favor of denying the issuance of an injunction. As Medike has failed to establish that any of the information that Giller and

14

Barnes have used at KT Trims is entitled to trade secret protection, Medike has not established that Giller and Barnes have used information other than general business knowledge they acquired over the course of their previous employment. Given Medike's failure to establish a likelihood of irreparable harm, the balance of the equities tips in Defendants' favor. In addition, under such circumstances, public policy strongly disfavors overbroad constraints on employee conduct.

## IV. Conclusion

For the foregoing reasons, Medike's application for a preliminary injunction is DENIED.

SO ORDERED.

Dated: January 12, 2024
       New York, New York

_____
J. PAUL OETKEN
United States District Judge